## Emerson and the Penn Fuel Company, et al. *versus* The Commonwealth ex rel. Attorney General.

</div>

1. The General Corporation Act of 1874, providing, *inter alia*, for the incorporation of gas companies, does not authorize the creation of a corporation for the purpose of supplying " natural gas " to consumers. The Act contemplates only the supply of a manufactured product, whether gas, light, or heat.

2. The Fuel Gas Company was incorporated under the said Act of 1874, for the purpose of supplying "heat to the public from gas, within the city of Pittsburgh." A month afterwards the Penn Fuel Company was chartered under the said Act " for the purpose of supplying heat to the public within the city of Pittsburgh by means of natural gas conveyed from such adjoining counties as may be convenient."

Upon quo warranto against the Penn Fuel Company to test the validity of its charter, the court of Common Pleas *held:* (1) "That the Act of April 29th, 1874, authorizes the incorporation of companies for supplying heat from natural gas, such as was granted the Fuel Gas Company." (2) That clause 3 of section 34 of said Act, providing for an exclusive right, as therein defined, is not unconstitutional. (3) That the Penn Fuel Company, having been incorporated subsequently to the

·[Emerson *v.* Commonwealth.]

incorporation of the Fuel Gas Company, for the same purpose and within the same district, said charter to the Penn Fuel Company was in contravention of said clause 3 of section 34 of the Act of 1874, and void.   Judgment of ouster was, therefore, entered against the Penn Fuel Company.

Upon writ of error, the Supreme Court *held :*   ·

(1) That the franchises as described in the said two charters are not identical, and therefore not necessarily hostile to each other, under the 34th section of said Act granting an exclusive privilege to the company first chartered.                                                           /

(2) That the said Act of 1874 did not authorize either of said companies; to supply " natural gas " to be converted into heat by the consumer.   ,

(3) That as the respondent's charter was to supply " heat," and there-' fore nominally within the terms of the Act, the court could not say that the charter was void.   . .

(4) That the court below erred in holding that the franchise granted to_ the Fuel Gas Company was exclusive as against the Penn Fuel Company; hence judgment of ouster was erroneous, and the same was reversed, and a *venire facias de novo* awarded.   ·

3. Whether, under the said 34th section of the Act of 1874, a gas or water company may acquire or hold the exclusive privilege thereby conferred, · as against a company subsequently chartered for the same purpose, · covering the same district, not decided.   · · ·

November 11th, 1884.    Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.   PAXSON, J.,· absent.

ERROR to the Court of Common Pleas No. 1, of *Allegheny county :* Of October and November Term, 1884, No. 72.

Quo warranto, by the Commonwealth, ex rel. the Attorney-General, against Edward O. Emerson et al., and the so-called " Penn Fuel Company," requiring the defendants to show by what authority they claim to possess and exercise the franchises, etc., of a corporation called the Penn Fuel Company within the county of Allegheny for the purpose of " supplying heat to the public within the city of Pittsburgh by means of natural gas conveyed from such counties as may be convenient."

The information set forth that on January 19th, 1882, the " Fuel Gas Company of the county of Allegheny," was incor-' porated under the Corporation Act of April 29th, 1874, for the_ purpose of supplying heat to the public within the city of· Pittsburgh from gas, which company claimed the exclusive privilege provided for in the third clause of the 34th section of the said Act of 1874, which reads as follows :

" The right to have and enjoy the franchises and privileges of such incorporation within the district or locality covered by its charter shall be an exclusive one ; and no other company shall be incorporated for that purpose until the said corporation shall have, from its earnings, realized and divided among its stockholders, during five years, a dividend equal to

[Emerson v. Commonwealth.]

eight per centum per annum upon its capital stock: provided," etc.

That said "Fuel Gas Company" had as yet divided no earnings among its stockholders; and averred that the defendants' charter was invalid, because it infringed upon the said exclusive right vested in the Fuel Gas Company.

The defendants pleaded specially their letters patent, and averred that the monopoly•or exclusive right claimed by the Fuel Gas Company was not granted by the Act of 1874, or if intended so to be, that said Act was in this respect unconstitutional. Replication and issue.

On the trial, before STOWE, P. J., there being no dispute as to the facts, the court reserved all the plaintiffs' and defendants' points (affirming pro forma those of the plaintiffs and refusing pro forma those of the defendants), and directed the jury to find a verdict for the plaintiffs, subject to the questions of law so reserved. The facts and questions of law reserved are set forth in the opinion of the court below upon the reserved questions, infra.

Verdict accordingly, for plaintiff, subject to the questions reserved.

Subsequently, after argument, as on a motion to enter judgment for the defendants non obstante veredicto, the court entered judgment of ouster on the said verdict in the following opinion by STOWE, P. J.:

According to the undisputed evidence in the case, on the 19th and 26th of August, and September 2d, 1881, in the regular edition and issue of the *Evening Chronicle* and Pittsburgh *Telegraph*, two public newspapers published in the city of Pittsburg, county of Allegheny, the following notice was printed and published, to wit:

"Notice is hereby given that application will be made to His Excellency, Henry M. Hoyt, Governor of the Commonwealth of Pennsylvania, for a charter of incorporation of the Allegheny County Fuel Gas Company, in accordance with the provisions of the Act of Assembly, passed April 29th, 1874. The character and objects of said corporation is to manufacture and supply fuel gas in the county of Allegheny."..

H. & G. C. BURGWIN,
Attorneys for Applicants.

Under and in alleged pursuance of said notice and Act, April 29th, 1874, M. A. Arnholt and others on the 19th day of January, 1882, filed in the office of the Secretary of the Commonwealth, articles of association for the purpose of the procuration of a charter and the incorporation of a company, to be known by the name of the Fuel Gas Company of the

county.of Allegheny, and stating therein that the purpose of said corporation was the supplying of heat to the public within the city of Pittsburgh, from gas." The Governor approved the said application, and in due form of law, letters patent were issued to the Fuel Gas Company of the county of Allegheny, on the 19th day of January, 1882.

Subsequently, on the 24th day of February, 1882, the Governor after the ordinary notice and preliminary steps required by said Act of Assembly, granted and issued to Edward O. Emerson, and .others, the defendants in this suit, a charter of incorporation, under the name of the Penn Fuel Gas Company, the business of which was to be transacted in Pittsburgh, of the county of Allegheny, and the purpose whereof, as set out in their application to the Governor, was: "Supplying heat to the public within the city of Pittsburgh, by means of natural gas, conveyed from such point or points within the county of Allegheny and adjoining counties, as may be convenient."

The Fuel Gas Company proceeded with reasonable diligence and laid pipes for the purpose of carrying on their business, as set out in their charter, in the city of Pittsburgh, and have been gradually extending them over the city. As yet, no dividends have been declared or earned by the company.

It was admitted on the trial, that several Acts of Assembly had been passed and were now in force, incorporating gas companies, viz: An Act to incorporate the Pittsburgh Gas Company, passed in 1848. (See P. L. 1848, p. 213.) An Act to incorporate the Consolidated Gas Company, passed in 1872. (See P. L., 1872, p. 1309.) An Act to incorporate the Monongahela Gas Company, passed in 1872. (See P. L. .1872, p. 621.) An Act to incorporate the East End Gas Company. (See P. L. 1869, p. 711,) and a supplement to the Act incorporating the Pittsburgh Gas Company, passed in 1869; (see P. L., p. 817.) The general Act of March 11th, 1857, to provide for the incorporation of gas and water companies, was also referred to. It was also admitted that the several companies whose charters had been offered in evidence, were duly incorporated and had done business under their charters prior to the Act of .1874. It was shown that companies organized under these Acts had furnished quite a number of the citizens of Pittsburgh heat from gas as well as light. There was also evidence admitted showing that gas was made from coal under what is known as the "Siemens process," for heating purposes, by converting it into a gaseous material, and that the process had been used by Park Bros.' Steel Works in Pittsburgh for a long time, ten years at least, and that this process was patented.

It was shown that the Penn Fuel Gas Company had paid

$125 to State Treasurer on account of bonus on charter, February 28th, 1883.    December, 1883, thirty-five dollars for filing election return and certificate of increase of capital stock to Department Secretary of Commonwealth, and December 18th, 1883, thirty-five dollars for fee for filing election return and certificate of indebtedness to Department Secretary, and that the defendant company had expended between $200,000 and $300,000 in carrying out the purposes of the charter, about one third of which was in the city of Pittsburgh.    The Fuel Gas Company also showed that it had paid its proper bonus on charter and taxes.

Under the foregoing state of facts, none of which were controverted, the court was requested to charge the jury on the part of plaintiff:

1. That the Commonwealth having on January 19th, 1882, issued letters patent to the Fuel Gas Company of the county of Allegheny for the supply of heat to the public, from gas within the city of Pittsburgh, under the Act entitled "An Act to provide for the incorporation and regulation of certain corporations" approved April 29th, 1874, no other company could, under said Act, be incorporated for that purpose until the said Fuel Company had from its earnings realized and divided among its stockholders during five years, a dividend equal to 8 per centum per annum upon its capital stock.

2. Under the said Act approved April 29th, 1874, neither the Governor nor Secretary of the Commonwealth could on February 22d, 1882, or subsequent thereto, issue to the Penn Fuel Company a charter for the purposes for which its pretended letters patent were issued.

3. Under all the evidence the plaintiff is entitled to your verdict.

The defendants requested the court to charge the jury:

1. That the letters patent and charter put in evidence by the defendants make a prima facie case for the defendants, and the plaintiffs have not shown any facts overcoming said prima facie case and the verdict of the jury should be for the defendants.

2. That under all the evidence, pro ut same, the plaintiff is not entitled to recover, and the verdict should be for defendants.

All these points were reserved, the court saying to the jury: "We instruct you for the present that the plaintiff has a right to your verdict, reserving, however, the question as to the rights of the parties under the pleadings and evidence (none of which is controverted by either party), for their consideration."    And thereupon a verdict was rendered for the

[Emerson *v.* Commonwealth.]

plaintiff subject to the opinion of the court upon the question of law reserved.

It cannot apparently be denied that if the Fuel Gas Company has a valid charter, and the clause of the Act of Assembly, under which it was granted, giving it the exclusive right in such case, to have and enjoy the franchises and privileges of such incorporation, to wit: " To supply heat to the public by gas within the city of Pittsburgh," is constitutional and valid, the Governor had no right to incorporate the defendant company, and judgment must be entered against it. The questions thus presented are of great importance, and we apprehend, can be satisfactorily decided by the Supreme Court only, and to accomplish this end, the cause has been put in its present shape.

After a careful consideration of the matter, we, however, have come to the following conclusions :

1. That the Act of April 29th, 1874, authorizes the incorporation of companies for supplying heat from natural gas, such as was granted the Fuel Gas Company, January 19th, 1882.

2. That the restrictions imposed by clause 3 of sec. 34 of the Act of April 29th, 1874, that " The right to have and enjoy the franchises and privileges of such incorporation within the district or locality covered by its charter (to wit, city of Pittsburgh), shall be an exclusive one," is not legally objectionable as falling within the rule appertaining to monopolies, and is therefore constitutional ; and

3. That the objections raised by defendants in regard to the alleged irregularities, as to notice in procuring the charter of the Fuel Gas Co. are not such as will justify us in holding the charter to be illegal and void, even admitting *pro tempore* that such objection can properly be raised in this proceeding.

These views, if correct, settle the question as to defendants' rights under their charter, so far as they are involved in this case, and make it our duty to order that judgment be entered that defendant be ousted and altogether excluded from all franchises, privileges and powers set up and claimed to be in them by reason of the charter or letters patent granted them, the said Penn Fuel Co., by the Governor of Pennsylvania, on February 22d, 1882, and that defendants pay the costs, which is now ordered to be done upon payment of the verdict fee.

Judgment of ouster was entered.

The defendants took this writ of error, assigning for error the *pro forma* answers to the plaintiffs' and defendants' points ; and that "the court erred in not entering judgment for defendants upon the reserved question *non obstante veredicto.*"

[Emerson v. Commonwealth.]

*George Shiras, Jr.*, for plaintiffs in error.—This record presents two questions : (1) as to the validity of that portion of the Act of 1874 establishing an exclusive right in a corporation organized under its provisions; (2) whether a corporation organized under said Act to furnish natural gas as a fuel is within the clause of the Act granting such exclusive right. The first is a question of legislative power, the second is one of interpretation of the statute.

1. We assume that the Act of 1874 authorizes the creation of corporations to supply the public with natural gas, but we affirm that the legislature has no power to grant a monopoly or exclusive right to any such corporation, and that therefore so much of the Act of 1874 as undertakes to grant such exclusive right is unconstitutional and void. In the 17th section of the Declaration of Rights, it is enacted that " no law making irrevocable any grant of special privileges or immunities shall be passed." The 7th section of Art. III. of the Constitution prohibits special legislation granting to any corporation, association or individual any special or exclusive privilege or immunity. The monopoly attempted to be granted by the Act of 1874 is virtually a special privilege to one particular company, and for an unlimited time ; because so long as the company refrains from declaring eight per cent. dividends, their monopoly remains : Norwich Gas Co. *v.* Norwich City Gas Co., 25 Conn. 19 ; Chicago *v.* Rumpff, 45 Ill. 90 ; Citizens' Gas Light Co. *v.* Louisville Gas Co., 1 Amer. & Eng. Corp. Cases 166 ; Slaughter House Cases, 16 Wall. 36. The power cannot be claimed in this case as an exercise of the police power, as in Butchers' Union Slaughter House Co. *v.* Crescent City Slaughter House Co., 111 U. S. 746.

2. A careful reading of those portions of the Act of 1874 that bear on the matter in hand, will show that the legislature did not *intend* to confer such exclusive privilege in the case of a company organized to supply natural gas. See §§ 34, 35, 38, which evidently refer to companies formed for the artificial manufacture of gas.

*John Dalzell, Knox & Reed* and *John M. Kennedy*, representing certain gas companies not parties to the suit, but interested in the decision, were permitted to submit an additional printed argument on behalf of the plaintiffs in error.—It was contended therein that the proper construction of the Act of 1874 was that it authorized the incorporation of companies for the manufacture and supply of heat, *as heat*, not the furnishing of any of the natural products from which heat or light might be evolved by combustion, such as coal, wood, water, oil or natural gas. The distinction between heat and

the materials from which heat can be produced is obvious. Fuel is defined by Worcester as "the materials which serve as the aliment of fire; any combustible substance used for the production of heat." *Natural gas is not heat, it is fuel.* Heat is not matter but a quality of matter. Scientists regard it as a form of motion. While heat may be generated in many ways it is always one of the results of combustion. Natural gas is not only a fuel, but the fuel of all others in its heat producing power, and with us a practical fuel, as it can be obtained in sufficient quantity and will be furnished at a moderate price, unless the business is throttled in its infancy by a monopoly. The contention that this Act provides for the supply of natural gas goes too far, in this, that natural gas is a material from which the thing covered by the Act can be produced, and not the thing itself; if this material from which heat is produced, is covered by the Act, then are other natural products within its terms, for from other forms of matter may heat be evolved by the same process necessary to eliminate it from gas, viz., by combustion. The Fuel Gas Company contemplates the supply of *fuel* of a certain kind, and asks this court to decree that it has a monopoly for the supply of such fuel. No legislature has power to grant such a monopoly, and our legislature has not in this case attempted to do so. In ascertaining the intent of the Act, it is proper to consider the conditions which existed at the time of its passage. At that time, natural gas, or at least its utility, had not been discovered. No charter for the purpose of utilizing it had ever been asked for. The first charter for that purpose was granted in 1879 (P. L. 224). Between that date and the first of July, 1883, thirty-eight companies for the supply of natural gas were formed, and from July 1st, 1883, to the present, a period of a little more than one year, over two hundred more have been incorporated. In view of the circumstances which existed at the time of the passage of the Act, and of the language used in the Act itself, is it reasonable to assume that the legislature intended that one company should monopolize a natural product of the earth, and exclude all other corporations from assisting in its supply to the second city in the Commonwealth?

*D. T. Watson* (with him *Lewis C. Cassidy*, Attorney-General, and *James P. Brown*), for the defendants in error.—We regard the case as raising one question, and that is this: Had the Governor of the state of Pennsylvania the power, under the Act of 1874, on February 22d, 1882, to issue to the Penn Fuel Company a charter for the purpose for which he had already issued on January 19th, 1882, a charter to the Fuel Gas Company. If he had not such power, then the judgment

[Emerson v. Commonwealth.]

entered in the court below must be affirmed, because the letters patent he issued on February 22d, 1882, to the Penn Fuel Company would be utterly void.

Evidently the proper construction of the Act of 1874 (and in which we agree with the plaintiffs in error), is that the Act does authorize the incorporation of a company for the purpose of supplying heat from gas, either natural or artificial. It expressly provides for the forming of corporations for the purpose of "the supply of light or heat to the public by any other means." This we all agree includes the supply of heat from natural gas. The Act makes no distinction as to how the gas shall be produced or procured. The corporation to supply gas might, under the Act, produce it from coal or wood, or any other substance. Further, the plaintiffs in error agree with us that the purposes for which the Fuel Gas Company and the Penn Fuel Company were incorporated are the same. The only difference between the charters is that the purpose of the Fuel Gas Company may be broader than that of the Penn Fuel Company, but it clearly includes, as all admit, the purpose for which the Penn Fuel Company was incorporated. The Fuel Gas Company having been incorporated first, the question arises whether the third clause of the 34th section of the Act of 1874 is constitutional. We submit that it is, for the following reasons : The Act was a general Act, passed by the Legislature as a matter of grace and not of right, authorizing the Governor to grant letters patent for certain specific purposes, and restraining him, after having executed that power, from granting other letters patent for the same purpose, except in a defined contingency. The Constitution, far from expressly prohibiting the Legislature from granting exclusive privileges to corporations by general laws, impliedly recognized such right by expressly prohibiting local or special laws granting special privileges. The legislative power which we contend for is supported by the following authorities : The Slaughter House Cases, 16 Wall. 36 ; Wisconsin v. Milwaukee Gas Co., 29 Wis. 454 ; Memphis v. Memphis Water Co., 5 Heiskell (Tenn.) 495 ; Crescent City Gas Light Co. v. New Orleans Gas Light Co., 27 La. An. 138 ; Boston and Lowell R. R. Co. v. Salem R. R. Co., 2 Gray 33, 34 ; Livingston v. Van Ingen, 9 Johns. 507 ; Ogden v. Gibbons, 4 Johns. Ch. 150 ; (this case was reversed in 9 Wheat. 1, but upon a different ground ;) Charles River Bridge v. Warren Bridge, 11 Peters 604 ; Morawetz on Private Corporations, § 481 ; Cooley Const. Lim. 346 ; Piscataqua Bridge v. N. H. Bridge, 7 N. H. 35. There is a distinction between a monopoly and an exclusive right for a limited time : Charles River Bridge v. Warren Bridge, 11 Peters 607.

The grant of the privilege in this case was not in contravention of any common right, which the citizen theretofore had, and cannot, therefore, be called a monopoly. The grant is not perpetual by its terms, and moreover, under § 4, of the Act of 1874, it may be revoked by the Legislature, whenever, in their opinion, it may be injurious to the citizens of the Commonwealth. It is otherwise limited by clauses 3 and 7, of § 34 of the Act.

The only case in which this provision of the Act has been construed by the Supreme Court is Lehigh Water Company's Appeal, 6 Out. 515, in which it was held that while the right to construct waterworks in a particular district covered by the charter was exclusive as against other water companies subsequently chartered, it was not exclusive as against the right of the municipality itself to construct waterworks. .

As to the question of intention, the words of the Act evidencing an intention to confer an exclusive right to the company first lawfully organized under it, are so plain and unambiguous as not to admit of construction. That the clause applies to companies to supply natural gas is as evident as that it applies to companies to supply natural water. The provisions of the Act relating to necessary buildings, the regulation of the quantity and purity of gas, etc., are as applicable to natural gas as to artificial gas or to water. While in one sense natural gas, like water, is a product of nature, both can only be obtained and furnished, or purified, by artificial contrivances which are a species of manufacture, and by methods of transportation involving large capital. The clause names gas and water companies, not some gas companies, but all; not gas companies who proposed merely to manufacture gas, but those who proposed to furnish heat from any kind of gas.

We are unable to see how the argument in the supplemental paper book of the intervening corporations, with reference to the distinction between heat and gas, can help the plaintiff in error. The words of the 11th clause of the second section of the Act of 1874 are: "The manufacture and supply of gas or the supply of light or heat to the public by any other means." If, by the argument, it is intended to say that this refers to the supplying merely of heat or light as contradistinguished from the materials, the combustion of which produces the heat or light, then we reply: (1) If this is so, the judgment of the court below necessarily must be affirmed; because then there is no authority whatever to incorporate any company for furnishing heat or natural gas. This conclusion cannot be escaped from. (2) The argument seems to go upon the ground that the heat or light may be supplied as dis-

tinguished from the materials which produce them; and not only this, but that the article itself, which produces the heat or light, must be at a distance from the place where the heat or light is used, and the heat or light itself, as distinguished from the article which produced it, must be conveyed through pipes, etc. There is no warrant for such a construction; nothing of the kind is said in the Act. For example: When it is said, furnishing *light* by any other means, what reason is there to say that this means that light must be produced, by combustion or otherwise, some distance from the place where it is to be used, and then the *light itself* conveyed to the place where it is wished?

On the whole case we submit:

(1.) The plaintiff in error and ourselves agree that the charter to the Fuel Gas Company for the supply of heat from gas to the public within the city of Pittsburgh includes heat from natural gas.

(2.) That the purpose for which the Penn Fuel Company was incorporated is the same as that for which the Fuel Gas Company was incorporated in this: (*a.*) Each is for supplying heat from gas. (*b.*) Each is for supplying the city of Pittsburgh. (*c.*) Each by virtue of its charter claims the right to enter upon the streets, lanes and alleys of Pittsburgh and lay down pipes, etc. (*d.*) And each claims the right of eminent domain for that purpose. (*e.*) And each claims all these things under the same Act of 1874.

(3.) As the Fuel Gas Company charter was granted January 19th, 1882, the Act forbids the granting of any other charter until the Fuel Gas Company had for five years paid eight per cent. per annum on its capital stock. Such dividends it is admitted have not been made or paid.

(4.) Therefore, on February 24th, 1882, when the Governor issued the charter to the Penn Fuel Company, he had no power so to do, and the said charter is null and void.

Mr. Justice GREEN delivered the opinion of the court, February 2d, 1885.

This proceeding originated in an information filed by the Attorney General, against the defendants, alleging that they claimed to exercise the franchises, rights and privileges of a corporation called the Penn Fuel Company, formed for the purpose of supplying heat to the public within the city of Pittsburgh by means of natural gas conveyed from such adjoining counties as may be convenient. The information denies that the respondents were ever incorporated, and that the Penn Fuel Company exists in law, and alleges that any pretended franchise, rights or privileges claimed by the re-

spondents under the Act of 1874 are fraudulent and null and void, and have no existence under the laws of Pennsylvania. As a special cause of invalidity of the defendants' charter, it is alleged further in the information that letters patent had been issued to another corporation called "The Fuel Gas Company," conferring the same franchises · as are claimed by the defendants, at a date anterior to the grant of letters to the. defendants. In consequence of this prior grant it is claimed that the Fuel Gas Company became on the 19th day of January, A. D. 1882, entitled to the exclusive privilege and franchise of supplying the public within the city of Pittsburgh with heat from gas, and that the charter of the defendants, which was not obtained until February 22d, 1882, was illegal and void. This claim is founded upon the provision contained in the third clause of the 34th section of the general corporation Act of April 29th, 1874, which declares that the right to enjoy the franchises and privileges conferred by that section shall be exclusive within the district covered by the charter, and that no other company shall be incorporated for the same purpose, until the company first incorporated shall have from its earnings realized. and divided among its stockholders a dividend equal to eight per cent. per annum for five years upon its capital stock. The information alleges that the Fuel Gas Company had not been in existence for five years and had not. divided any earnings among its stockholders.

· Testimony was taken showing the incorporation of the Fuel Gas Company, and also that defendants had laid a large quantity of. pipe and were engaged in furnishing natural gas to consumers. Mr. Pew, one of the defendants, being asked what the gas was that they were furnishing, replied, "It is natural gas just as it comes from the earth." To show that this was in conflict with· the franchise of the Fuel Gas Company the president of that company was examined on behalf of the relator. He said his company had laid some eight miles of pipe in the city, and was then asked : " State whether your company made provision for the procuration of the gas from the gas well in Westmoreland county ? A. It did. Q. Is it, in connection with these other pipes, now furnishing that natural gas ? A. It is." It will thus be seen that the contest between these two companies is upon the corporate right to furnish natural gas to the citizens of Pittsburgh. On the argument and in the paper books two points were made. by counsel for the respondents. One was that the Act of 1874 did not authorize charters for supplying natural gas, and the other, that the exclusive privilege granted by the third clause of the 34th. section was illegal and void.· Both these

propositions were resisted by the counsel for the relators, and both are therefore before us for our consideration and decision.

The letters patent issued to both of these corporations omit all description of the purpose for which either was incorporated, but the organization certificates do set forth the purpose of each. Thus, in the case of the Fuel Gas Company it is stated: "The purpose for which it is formed is the supply of heat to the public from gas within the city of Pittsburgh." In the case of the Penn Fuel Company the language is as follows: "Said corporation is formed for the purpose of supplying heat to the public within the city of Pittsburgh by means of natural gas conveyed from such adjoining counties as may be convenient." If the franchises thus described are identical, the grant of the second would be in hostility with the prohibition contained in the third clause of the 34th section, and we would be remitted to the question whether the exclusive privilege given to the first grantee of the franchise is contrary to law and void. But are these franchises identical? We think clearly not.

The Fuel Gas Company is authorized "to supply heat to the public from gas within the city of Pittsburgh." The thing to be supplied is "heat," the means of supplying it are "from gas within the city of Pittsburgh." Read literally and strictly these words import that the gas used must be produced within the city of Pittsburgh. No authority is given to obtain it from without the city limits and the direct and natural meaning of the words in the collocation in which they are placed is that the heat to be supplied must be from gas within the city. If this company should go into an adjoining county to obtain its gas it might well be asked as to the source of its authority to do so, and the best reply it could make would be the quite doubtful authority contained in the words above quoted. But passing this question, it is very certain that this company may furnish heat produced from any kind of gas, manufactured or natural. There is no limit or restraint put upon it as to the kind of gas it may use, and hence any kind of manufactured gas, and any species of natural gas, may be used in producing the heat which it is authorized to furnish.

Turning now to the description of the franchise of the Penn Fuel Company, we find it to be of a radically different character. Thus, "supplying heat to the public within the city of Pittsburgh by means of natural gas conveyed from such adjoining counties as may be convenient." It is very clear that this company cannot use any kind of manufactured gas but is limited to natural gas alone, as the fuel which it may employ

in providing heat. In addition to this it must be natural gas conveyed from convenient adjoining counties. In designating a particular source from which its gas must be derived all other sources are excluded, and it follows that this company must go outside the limits of Pittsburgh to obtain its gas. So that it follows that the Fuel Gas Company has a franchise to furnish heat produced from any kind of gas within the city of Pittsburgh, and the Penn Fuel Company has a franchise to furnish heat produced from natural gas alone and obtained from adjoining counties. If the Fuel Gas Company chooses to manufacture its gas from coal or other substance, and is entitled to an exclusive franchise, neither the Penn Fuel Company nor any other company can furnish heat from natural gas to the citizens of Pittsburgh, and they must do without it for at least five years from the date of the charter of the Fuel Gas Company, and most probably for a much longer time. Such a result would be intolerable and not to be judicially declared except in obedience to the plainest legal requirement. There is no such necessity in this case. These two franchises are not identical and therefore not necessarily hostile to each other. The prohibitive language of the third clause of the 34th section is, "and no other company shall be incorporated *for that purpose* until," &c; that is for the same purpose which is covered by the franchise first granted.

It is scarcely necessary to say that exclusive privileges which affect great public interests must be most strictly construed, against the grantee and in the interest of the public. We do not decide that they are necessarily illegal. The case does not require it. But we are very clear that these two franchises are not identical, and therefore the one cannot operate to the exclusion of the other.

The remaining question raised by the evidence and the contentions of the parties, is of a larger and broader character. The proposition of the counsel for the respondents, which presents it, is that the Act of 1874 does not authorize the grant of a franchise to furnish natural gas. The whole of the legislation affecting the subject is contained in the Act in question. In the enumeration of the corporations of the second class described in the second section, the eleventh clause defines those for " the manufacture and supply of gas, or the supply of light or heat to the public by any other means." The 34th section provides as follows : "Companies incorporated under the provisions of this statute for the supply of water to the public, or for the manufacture and supply of gas, or the supply of light or heat to the public by any other means shall, unless otherwise provided by this Act, from the date of the letters

patent creating the same, have the powers and be governed, managed and controlled as follows:

Clause 1. Where any such company shall be incorporated as a gas company, or company for the supply of heat or light to the public, it shall have authority to supply with gas light the borough, town, city or district where it may be located, and such persons, partnerships and corporations residing therein or adjacent thereto as may desire the same at such price as may be agreed upon, and also to make, erect and maintain therein the necessary buildings, machinery and apparatus for manufacturing gas, heat or light from coal or other material, and distributing the same," with the right to enter upon the streets to lay pipe, &c.

It seems to us plain that the words of this section contemplate, and authorize, the creation of corporations for the manufacture and supply of gas, and the supply of light or heat by any other means. Of course the only kind of gas companies that are authorized are those which manufacture gas, and this necessarily excludes corporations for supplying natural gas, that being a product of nature, and not the result of any manufacturing process. The other companies authorized are those for supplying light or heat produced by any other means. If the respondents in this suit did actually furnish heat, they could contend with great force that the largeness of expression, " by any other means," included natural gas as one of those means. It is not easy to see that such contention could be resisted, unless by considering the language of clause 1, immediately following. That language confers the right to make, erect and maintain " the necessary buildings, machinery and apparatus for manufacturing gas, heat or light from coal or other material and distributing the same." These words import, literally, an intent that the light or heat which is supplied shall be manufactured from gas, coal or other material. As the body of the section and the added clause are joined together, and constitute the entire scheme for granting power to furnish gas and light and heat, they must be construed together. Regarded in this manner we feel obliged to hold that whether the article furnished be gas or light or heat, it must be the result of a manufacturing process. That is, if gas is furnished it must be manufactured, if light or heat is furnished it also must be manufactured. Nor is this inconsistent with the language of the section which speaks of the "supply of light or heat by any other means." For neither light nor heat can be produced by any human agency except by some species of manufacture. If either is the result of the mere combustion of natural substances, that very combustion is a method of manufacture. In the nature of the case the

[Emerson *v.* Commonwealth.]

material for combustion, and the gases which support it, must be furnished in large quantities, their union effected, and an economical and safe means of transportation of the product provided. It is well known that heat is furnished by means of steam and hot water in pipes or by currents of heated air produced by direct radiation from heated metallic surfaces.

This brings us to the decision of the question whether the Act of 1874 authorizes the creation of corporations for the supply of natural gas. The furnishing of natural gas is not the furnishing of heat. Natural gas is not heat. It is a fuel, a substance which may be converted into heat by combustion with atmospheric air. When the gas is delivered to the consumer it is still gas only. It is not heat. If the consumer does not produce combustion, no heat is obtained, and if he does produce it, the act of doing so is his act and not that of the company which furnishes the gas. In any point of view, therefore, it must be said that a company which furnishes natural gas is not necessarily furnishing heat. It would scarcely be contended that companies could be chartered under this section of the Act of 1874, for supplying coal, wood, oil, peat or other substance whose combustion produces heat, yet they all belong alike in the category of fuels. The fuels must be destroyed in order that their calorific quality may be developed, but when they are furnished in their original, natural state it can not be said that they have been delivered in their developed form. They are still subject to any use to which the consumer may choose to apply them. If he does not choose to convert them into heat, no heat is obtained, and it certainly can not be said that the company has furnished any heat to the consumer. But if he does so convert them it is equally true that the heat thus obtained is not received from the company. We hold, therefore, that the Act of 1874 does not directly provide for the creation of corporations with authority to furnish natural gas nor does it do so indirectly by the authorization of companies for supplying heat. In view of the immense stores of this valuable fuel which have so recently been discovered, and of the great public interests to be subserved by the legal authorization of corporations for supplying it, we think the subject should be brought to the attention of the legislature without delay so that appropriate legislation may be obtained. And we think it will be well for the law-making power to consider with great care the question whether it is expedient to confer upon any corporations it may authorize, the exclusive privilege contained in the Act of 1874.

This case comes before us in rather a peculiar manner. A jury trial was had in the court below and the record is brought

[Emerson *v.* Commonwealth.]

here by writ of error to the judgment entered on the verdict. We reverse the judgment on the ground that the court erred in holding that the franchise granted to the Fuel Gas Company was exclusive as against the Penn Fuel Company.

But we hold also that there is no legal authority to confer a franchise to supply natural gas to consumers, and it appears by the evidence that this is the only kind of franchise that either the relator or the respondent is exercising. If such should be the distinct finding of the jury on another trial, it will be the duty of the court to say that there is no authority for such a franchise in the present state of our legislation and that all acts done in its exercise are illegal and void. We cannot, however, say that the respondent's charter is absolutely void, because on its face it is a charter to furnish heat, and as such is nominally in conformity with the law.

As the charters of both these companies were granted four years ago, and the franchise to furnish heat has apparently never been exercised by either, a question may possibly arise whether, as between them, or as between them and others, there has not been an abandonment of that franchise, so as to disable either of them from claiming an exclusive privilege under the Act. We express no opinion on the subject, but it may well be questioned whether a charter can be obtained under the 34th section of the Act of 1874, and then, without being used, be held *in terrorem* over all other persons who may desire to obtain, and in good faith exercise, a similar franchise.

Judgment reversed and venire de novo awarded.

A motion for a re-argument was subsequently filed, which was dismissed in the following opinion, filed May 4, 1885.

GREEN, J.   We have considered with care the reasons assigned for a re-argument in this case and are not satisfied of their sufficiency.   Counsel are in error in supposing that we decided that the Act of 1874 did not authorize the incorporation of companies for furnishing heat from natural gas.   We carefully distinguished between charters for furnishing heat and those for furnishing natural gas itself; and we expressly declined to declare the respondents' charter void because it *was* a charter to furnish heat.

As the forty companies referred to in the second reason are not asking for any re-argument and have in no manner expressed any dissatisfaction with the decision made, but on the contrary some, at least, of them, were heard by counsel representing their views in an elaborate argument submitted with the paper books in this case, and in favor of the ruling expressed in our decision, we cannot regard the matters set

forth in the second reason as a correct expression of their sentiment or desires.

The third reason assigned is of much more practical moment, and if it raised even a doubt in our minds as to the correctness of our decision we would willingly order a reargument. But a patient examination of the 18th clause of the second section of the Act of 1874, which is supposed to confer the necessary authority to grant charters to furnish natural gas, fails to convince us that it has the slightest application to that subject. The eleventh paragraph of this section is the one which purports to confer whatever power was intended to be granted in relation to the supply of gas and heat. The 18th clause relates to corporations for " the carrying on of any mechanical, mining, quarrying or manufacturing business," and the 39th section of the Act provides for the details of the organization of such companies as the 34th section does for those mentioned in the 11th clause of the second section. The 18th clause directs that the companies thereby designated shall include all of the purposes covered by the Act of April 7th, 1849, and the Act of July 18th, 1863, and the several supplements to each of said Acts. The Act of 1863 (Bright. Purd. 1407), authorizes the incorporation of companies " for the purpose of carrying on mechanical, mining, quarrying or manufacturing business in this Commonwealth except that of distilling or manufacturing intoxicating liquors," and is no more extensive in the corporations enumerated than the 18th clause of the Act of 1874 itself. The Act of 7th April, 1849 (Bright. Purd. 992), authorizes companies to be formed " for the purpose of carrying on the manufacture of woolen, cotton, flax or silk goods, or of iron, paper, lumber or salt," none of which could possibly include natural gas. A supplement to the Act of 1849, passed April 20th, 1853 (Bright. Purd. 1000, pl. 40), extends the provisions of the Act of 1849, " so as to embrace companies formed for mining coal, and for mining, quarrying and preparing for market lime, marl, soda, hydraulic cement or other minerals, and smelting copper, lead, tin or zinc ores, and for quarrying marble, stone or slate, and for the manufacture of lumber, with the right of preparing for market the produce of their said mines and quarries, and vending the same." The words, " or other minerals," in this Act are the only ones which could by any possibility be claimed to include natural gas within their meaning. But it is quite impossible for us to regard a gas well as a mine or quarry, or natural gas as a mineral substance, to be mined or quarried and prepared for market, within any conceivable meaning to be imputed to the Legislature which passed this Act. At that time natural gas was unknown as a

fuel, but had it been perfectly well known it would have required far more precise and specific words than these to authorize the formation of companies for supplying it. The judicial power of the government may sometimes impute a legislative intent not expressed with perfect clearness where the words used import such intent, either necessarily or by a plain and manifest implication. But it would be a dangerous excess of judicial authority, not to be justified by any considerations, for a court to declare a law by the imputation of intent, when the words used do not import it, either necessarily or by plain implication, and when all the surroundings of the enactment clearly evince that the construction claimed could not have been within the legislative thought. We would have to forget all our decisions that a doubtful charter cannot exist, and to disregard entirely the line which divides the judicial from the legislative department of the government, were we to attempt to bring this case within the Acts of 1849 or 1863, or their supplements. It will be infinitely preferable that the law-making power should now be directly invoked to confer the requisite authority for the full development of this great and new industry in clear, plain terms, and enlightened by the experience of the recent past. If this is done we see no reason to doubt that the application will meet with a ready and hearty response from the representatives of the people, who possess all the power necessary to the occasion.

<div align="right">Re-argument refused.</div>