## COMMONWEALTH v. NORTHERN ELEC. L. & P. CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS OF DAUPHIN COUNTY.

Argued June 1, 1891—Decided October 5, 1891.

[To be reported.]

1. A corporation engaged in producing electricity, and selling it to customers for the generation of light, heat or power, is not a manufacturing corporation, within the meaning of § 20, act of June 30, 1885, P. L. 199, exempting from taxation the capital stock of manufacturing corporations not engaged in the manufacture of liquors, or of gas.

2. The exemption applies only to the class of manufacturing corporations created by the act of April 7, 1849, P. L. 563, and enlarged by subsequent acts; and it does not embrace companies performing a quasi public function, like gas and light companies, though their operations be within the definition of the term manufacture, given by lexicographers.

Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 43 May Term 1889, Sup. Ct.; court below, No. 425 June Term 1888, C. P.

On April 26, 1888, the Northern Electric Light & Power Company filed its appeal from an account settled by the auditor general and state treasurer, charging the company with a tax upon its capital stock for the tax year 1886, under § 4, act of June 7, 1879, P. L. 112. The appeal was accompanied by a specification of the defendant's objections, the first of which was in substance that the defendant was a manufacturing corporation, and as such was relieved from taxation under § 4, act of June 7, 1879, by § 20, act of June 30, 1885, P. L. 199.[1]

The case was tried on February 4, 1889, without a jury, upon a submission under the act of April 22, 1874, P. L. 109. On

Decision of Court below.

May 6, 1889, the court, SIMONTON, P. J., filed the following decision:

FINDINGS OF FACT.

1. Defendant is a Pennsylvania corporation, chartered under the provisions of the corporation act of April 29, 1874, P. L. 73, and its several supplements, for the purpose, as stated in the application for a charter, of "carrying on the business of manufacturing, procuring, owning, and operating various and different kinds of apparatus and machinery used in producing light, heat, or power by electricity, and to establish, put up, and run circuits, to use electricity in lighting streets and buildings, or to furnish these for heat or power, and to construct, erect, or set up all kinds and character of machinery and supplies used directly or indirectly as a part or in connection with or incidental to an electric plant for the arc or incandescent light, and necessary for the establishment, maintaining, and running of such a plant."

The business in which defendant is actually engaged is in furnishing light by electricity by the Thomson-Houston system only, to customers at an agreed price.

The manner in which the light is produced is stated as follows, in his testimony, by Prof. Henry Morton, president of the Stevens Institute of Technology, Hoboken, New Jersey, an expert in electricity and electric science of very great experience:

"The coal is burned in a furnace under a steam boiler; the steam is used in a steam engine to produce motion—produce power, as we call it; and the power is used to rotate the armature in a certain relation with what we call the magnetic field. Now, when the armature turns around in the presence of the magnetism of the magnetic field, currents are produced in the wires of which the armature consists, and those currents are carried along the wire, and affect the lamps when they reach them. And it is by that means that the electric force, or electricity, or electric power, is generated; and generated, you see, in consequence of the operation of those instrumentalities, the source being the coal burned under the boiler, and the result being those various transformations by which we finally reach the current which passes into the lamp, and is then again transformed into light.

Decision of Court below.

" The electricity, which furnishes the light, does not exist until the armature revolves.   The revolution of the armature brings into being something that did not exist before; that is, this electric energy, or energy in this electric form.   When the motion begins in most machines it begins by development from a minute quantity.   From that minute and insignificant quantity the revolution of the apparatus causes a development and the accumulation of the fluid, and accumulating as the result of that, and developing the current of electricity; and then this passes out and on to the wires, and there is the moment of creation—we may say, its creation.   But its source, in the philosophic sense, is the latent energy of the coal.   If the coal is not burned we cannot have the engine moved, nor the dynamo, and therefore we cannot get the electricity ; and the electricity is derived, as its prime origin, from the coal; but not, however, extracted from the coal,—it was not there, but created by utilizing the latent energy of the coal.

" The electricity which is created and gathered passes into the wire, and clear through the wire.   A dynamo machine may be likened, as being perfectly analogous in one sense, to a pump, which pumps something through a series of pumps ; and when we want to explain and work out problems on this subject of electricity, it is common for every one to turn from books, and to take the pumping of water through pipes as an analogy, and better than books."

In the arc system, light is thus produced: " The two points in the ordinary lamp—the two poles of the current, or the two carbon rods, which are suspended in it, are first brought in contact, so as to allow the electricity to gain a full, abundant play through their points.   Being in connection, the electricity begins to flow.   Having established this flow, the points are slowly separated by a slight interval.   As they are separated, the distance being infinitesimal, and very slowly, the energy of the current enables it to spring across the minute interval, and when it does so it produces a great heat, both at the point which it leaps from, and which it leaps to, and it vaporizes the carbon, and also, by special electric action through the points, and tearing through the particles of carbon, it evolves gas ; and so the space between the poles, as they are slowly drawn apart, is filled with an amount of gas vapor, and the vapor be-

comes intensely hot by the action of the current upon it, and also the carbon, a very combustible body in the presence of air, burns; and that is the true flame of gas, different only in degree in the candle; the solid matter of the gas is first burned in the vapor, and this burns, and that is the burning of the candle."

"In the case of the electric light, we have some combustion, or a portion of the combustion, by the carbons themselves, which, burning, forms carbonic acid, and that gives a part of the light; but only a portion. Considerably the larger proportion of the light developed in the arc, as we call it, is the light produced by the passage of electricity through that vapor; but the light so developed has its origin—the energy which there becomes light has its origin—in the burning of coal under the boiler of the engine."

2. Defendant made a report for the year embraced in the settlement, as required by the act of 1879, appraising its capital stock upon which a dividend for a less amount than six per cent had been made during the tax year, at $100,000; and on January 31, 1888, the auditor general settled an account against it for tax on capital stock, in accordance with said report, amounting to $300, under § 4 of the act of June 7, 1879, P. L. 114, and this is an appeal from said settlement.

3. The report containing the appraisement was made under protest, defendant claiming to be exempt from taxation, because it is, as it avers, a manufacturing corporation, and therefore within the terms of § 20, of the supplement to the act of June 7, 1879, passed June 30, 1885, P. L. 193, which repeals the revenue laws of this commonwealth so far as they apply to manufacturing corporations.

4. Defendant claims, in its specifications of appeal, that a considerable portion of its capital stock is invested in and represents patent rights granted by the government of the United States, and that the portion of its stock so invested is not taxable. But no evidence was given on the trial to establish this allegation, or which tended to show that the value of any patent rights was included in the appraisement, or that any capital invested in patent rights is taxed by the settlement appealed from. On the contrary, the proof showed, and we find as a fact, that the patent rights are worthless, and that the said settlement does not tax any capital so invested.

Decision of Court below.

—Upon the question of law raised by the facts so found, the court adopted, as if filed in this case, the opinion of SIMON-TON, P. J., in Commonwealth v. U. S. Electric L. Co., No. 427 June Term 1888, Court of Common Pleas of Dauphin county, which was in part as follows:

It is a well-settled principle that when a tax is claimed, a clear warrant of law for its imposition must be shown before it can be collected.    And it is equally well settled that when a tax is clearly imposed by general act, any one claiming exemption must show clearly that such exemption exists.    The principle, as stated in Cooley on Taxation, 146, is this: "The intention to exempt must in any case be expressed in clear and unambiguous terms; taxation is the rule, exemption is the exception.    All exemptions are to be strictly construed.    They embrace only what is within their terms."    To the same effect is Academy of Fine Arts v. Philadelphia Co., 22 Pa. 496, where it is said: "No interests, falling within the general description of taxable property, can claim exemption from bearing their just proportion of public charges, unless the exemption be so clearly expressed in the statute as to admit of no other construction.    It is never to be presumed that the legislature intend to lay unequal burdens upon the people; and their enactments are not to be construed so as to produce that result, unless the intent is so plainly expressed as to render it unavoidable."    Defendant is clearly included in § 4 of the act of 1879; it must therefore, to be relieved, show that it is unmistakably included in the exemption provided for in § 20 of the act of 1885.    In other words, it must show clearly that it is a manufacturing corporation.

We have not been referred to, nor have we been able to find any definition of the terms "manufacture" or "manufacturing," that do not limit them to the production of material substances. In Brande's Encyclopædia, "manufacture" is defined: "The term employed to designate the changes or modifications made by art or industry in the form or substance of material articles, in the view of rendering them capable of satisfying some want or desire of man; and manufacturing industry consists in the application of art, science, or labor to bring about certain changes or modifications of already existing materials."    Webster defines manufacture to be "the operation of making wares

Decision of Court below.

of any kind, the process of reducing raw materials to a form suitable for use, by the hands, by art, or by machinery;" and a manufactured article to be "anything made from raw materials by the hand, by machinery, or by art;" and practically the same definition is given by Worcester, who, explaining merchandise, goods, wares, and produce as synonyms, says that "wares are manufactured and may be goods or merchandise."

In an extended note to Engle v. Sohn, 41 Ohio St. 691 (52 Am. Rep. 103), reference is made to a large number of cases in which the question arose, what was a manufacture, or who was a manufacturer? And in every case in which it was held that either term applied, it was assumed that the articles produced must be material substances.

Whatever electricity may be, it is manifestly and admittedly not a material substance; and whatever electric light companies do, they do not, in generating or evolving electricity, "make changes or modifications by art or industry in the form or substance of material articles." They do not make "wares of any kind," nor "reduce raw materials to a form fit for use."

Because of the novelty of the subject, and of our desire to do justice to the defendant, we have adopted the language of its expert witness at considerable length in the finding of facts; but when all has been heard that can be said on the subject, nothing has been said to lead to the belief that electricity is a material substance, nor is it claimed by any one so to be; therefore, its production, or generation, or evolution does not come within the authoritative lexicographic, scientific, or legal definition of the terms "manufacture" or "manufacturing;" and hence we cannot say that defendant manufactures electricity.

It is, however, strenuously contended by defendant's counsel, that, even if it does not manufacture electricity, it does manufacture and sell light, and for that reason is a manufacturing company. But what is light? In 14 Encyc. Brit., 576, it is said: "Sound may be defined as any effect on the sense of hearing; and in the same way light may be defined as any effect on the sense of sight." And in the same authority, 8 Encyc. Brit., 569, in the article "Ether," it is said: "That light is not itself a substance, may be proved from the phenomenon of interference. A beam of light from a single source is

divided by certain optical methods into two parts, and these, after traveling by different paths, are made to reunite and fall upon a screen.  If either half of the beam is stopped, the other falls on the screen and illuminates it; but, if both are allowed to pass, the screen in certain places becomes dark, and thus shows that the two portions of light have destroyed each other. Now, we cannot suppose that two bodies when put together can annihilate each other; therefore light cannot be a substance."

So far as is at present known, it is the undulations of that which, because they do not know what it is, scientists call the "luminiferous ether" which produce "on the sense of sight" the effect of light.  But the undulations are no more material substances than the light itself.  They are to the ether what waves are to water, successive motion of different particles. Another analogy is the undulations in the air, which produce the "effect on the sense of hearing" which we call sound. These undulations with the telephone by electricity produce the effect of sound at great distances; and if we might judge by analogy, we should be inclined to say that it is the undulations of the "luminiferous ether," which, by the use of electricity, by means of electric wires, are induced and extended to the lamps and "produce the effect of light;" and that it might, with the same reason, be said, that in the use of the telephone sound is manufactured, as that in the use of the electric lighting apparatus there is a manufacture of light.

Without enlarging further upon a subject of which we confessedly know very little, we content ourselves with saying that defendant has not, in our opinion, so clearly shown itself to be a manufacturing corporation as to warrant us in holding that it is exempt from taxation upon its capital stock.

We do not overlook the argument of counsel, based upon the language used by the legislature in the incorporation act of April 29, 1874, P. L. 73, which in § 34, provided, among other things, that gas companies, or companies for the supply of light and heat, may erect and maintain "the necessary buildings, machinery, and apparatus for manufacturing gas, heat, or light from coal or other material, and distributing the same;" and in the supplement thereto, of June 2, 1887, P. L. 310, that: "Where any such company shall be incorporated for the sup-

Decision of Court below.

ply of heat, light, and fuel, or any of them, by any process of manufacture, it shall have authority," etc. ; but we understand that, in these acts, the term manufacture is used in the sense of producing or furnishing, and as a convenient single term sufficient for the purpose in view, but not intended as a legal definition or extension of the terms "manufacture" or "manufacturing."

The same argument is made from the language of Mr. Justice GREEN, in Emerson v. Commonwealth, 108 Pa. 111, in which he says: "Neither light nor heat can be produced by any human agency except by some species of manufacture. If either is the result of the mere combustion of natural substances, that very combustion is a method of manufacture." But it is manifest that the term "manufacture" is here used in its widest sense, as the antithesis to production by natural causes; and that it does not and was not intended to furnish any authority or criterion for the construction of § 20 of the act of 1885.

We do not think that corporations of the kind to which defendant belongs come within the policy of the legislature in enacting § 20, which we understand to be the proposed encouragement to manufacturing corporations to establish themselves and carry on their operations within the limits of the commonwealth rather than beyond its borders; a policy which could apply only to manufactories of such a nature that they might be located in one place or another as interest and preference might dictate. But electric light companies, if they exist at all, must exist in the towns and cities to be supplied with light, and cannot choose whether they will carry on their operations within or without the commonwealth. Therefore, exempting them from taxation would probably not bring capital into the state, and taxing them would certainly not drive it out.

—In the principal case, the court, accordingly, found the following

### CONCLUSIONS OF LAW.

1. Defendant is not a manufacturing corporation, and is not exempt from taxation on its capital stock by § 20 of the act of June 30, 1885, but is subject to the tax on capital stock imposed by § 4 of the act of June 7, 1879.[2]

5. The commonwealth is entitled to judgment as follows :

Arguments.

| | |
|---|---|
| Tax at three mills on $100,000, . . . . | $300.00 |
| Interest at 12 per cent., from April 27, 1888, . | 36.60 |
| Attorney general's commission, . . . . | 15.00 |
| Total, . . . . . . . | $351.60 |

for which amount judgment is directed to be entered against defendant, if exceptions be not filed within the time limited by law.

—Exceptions filed by the defendant having been overruled and judgment entered for the commonwealth in accordance with the decision filed, the defendant took this appeal, specifying that the court erred :

1. In not sustaining the objection specified by defendant.[1]

2. In the first conclusion of law.[2]

3, 4. In directing judgment to be entered for the commonwealth for $351.60, and in not directing judgment to be entered for defendant.

*Mr. M. E. Olmsted* (with him *Messrs. Morgan & Lewis*), for the appellant:

1. The single question presented by the appeal is whether the defendant is or is not a manufacturing corporation. The facts found by the court clearly show that the electricity employed is not a natural product, but is the result of man's invention and industry, and the light in which the company deals is produced by additional processes and is wholly artificial. Notwithstanding this, the court found that the defendant is not engaged in manufacturing, the decision proceeding upon the assumption that the word manufacture properly refers only to material substances, and that electricity and light are without substance. A reference to authorities upon the subject shows that electricity is not universally, if at all, conceded to be without substance, and that there are conflicting theories as to the nature of light. The correctness of the court's conclusions as to the immateriality of these things is, at least, uncertain.

2. This case, however, does not depend upon the correctness of the learned judge's conclusions on this point. We do not accept his definition of the term, manufacture. We contend that whatever is of use to man, and may be the subject of bargain and sale, is, when it results from the industry and inven-

tion of man, a manufacture within the modern meaning and use of that term: Lawrence v. Allen, 7 How. 793 ; Corning v. Burden, 15 How. 267 ; Murphy v. Arnson, 6 Otto 131; Definitions of manufacture in Ure's Philosophy of Manufactures; Johnson's New Univ. Cyclop.; Bouvier's Law Dict.; Burrill's Law Dict.; Curtis's Law of Patents, and Anderson's Dict. of Law ; People v. Ice Co., 99 N. Y. 181 ; Nassau Gas L. Co. v. Brooklyn, 89 N. Y. 489.    The sending of messages by means of electricity passing through a wire, is commerce: W. U. Teleg. Co. v. Texas, 105 U. S. 460.    Certainly, that which is the subject of commerce may be the subject of manufacture.

3. But we have still stronger ground.    The legislature, in the acts of assembly which constitute the charter of the company, has distinctly defined light as the subject of manufacture : Clause 1, § 34, act of April 29, 1874, P. L. 93.    The language, "manufacturing gas, heat or light," used in that act, was so interpreted in Emerson v. Commonwealth, 108 Pa. 111.    When, subsequently, the legislature enacted the provisions of § 20, act of June 30, 1885, P. L. 199, concerning manufacturing corporations, it must be presumed to have done so with full knowledge of that interpretation, and in view of it : Fulmer v. Commonwealth, 97 Pa. 503; Truxbury's App., 67 Me. 267; Cota v. Ross, 66 Me. 165; Trink v. Pond, 46 N. H. 126 ; Commonwealth v. Hartnett, 3 Gray 450; Commonwealth v. Standard Oil Co., 101 Pa. 119.    Moreover, the mere fact that the legislature of 1874 treated light as the subject of manufacture, is sufficient, apart from intervening judicial decisions, to show the meaning of the language used in the act of 1885 : Phila. etc. R. Co. v. Railroad Co., 53 Pa. 20.    Later legislation has used the word manufacture in the same enlarged sense : Act of June 2, 1887, P. L. 310.

4. Again ; the construction given to a statute by those charged with the duty of executing it, has great weight : United States v. Moore, 95 U. S. 763; Edwards v. Darby, 12 Wheat. 210; United States v. Gilmore, 8 Wall. 330; Greely v. Thompson, 10 How. 225 ; Union Ins. Co. v. Hoge, 21 How. 66 ; Matthews v. Shore, 24 Ill. 35 ; Graham's App., 1 Dall. 147 ; Steiner v. Coxe, 4 Pa. 13 ; Goddard v. Gloninger, 5 W. 209 ; United States v. Ship Recorder, 1 Blatch. 218 ; Sedgwick on Statutes, 216. The lists of incorporations published in the pamphlet laws from

1883 to 1889 exhibit numerous instances in which the governor and secretary of the commonwealth have granted charters for the purpose of "manufacturing" electric light, or electricity for lighting purposes.   These exhibit not only the view of the state's executive officers, but also the understanding of hundreds of incorporators as to the meaning and scope of the term.   And there is no reason to suppose that the legislature, in 1885, intended to discriminate against any manufacturing corporations, except certain ones specifically enumerated.   It was desirable to encourage the investment of capital in electric lighting within the cities of this state, and its taxation might lead capitalists to select cities in other states, in preference.

*Mr. W. U. Hensel,* Attorney General, (with him *Mr. Jas. A. Stranahan,* Deputy Attorney General,) for the Commonwealth :

1. We submit that the question, whether the defendant is a manufacturing corporation, is one of fact, and that the finding of the court against it is not reviewable as a question of law. If, however, the question is still open, then we claim that the definitions which the various authorities give of the word manufacture, all agree substantially in excluding a business such as that of the defendant, its result not being an article, or substance, or commodity, or a form of material, or wares, in the sense of any of the definitions.   It will not do to say that we do not know whether electricity is a substance or not.   This simply leaves the defendant's case unproved.   A company like the defendant, producing light by electricity, is no more a manufacturing company than is a telegraph, or telephone company, which produces sound for the use of its customers by the same means.

2. The reasons for exempting manufacturing corporations from taxation do not apply to electric light companies.   They stand on the same plane with water companies and like corporations.   The argument for the defendant, based upon the language of § 34, act of April 29, 1874, P. L. 73, and act of June 2, 1887, P. L. 310, is well answered by the court below.   And the effort to import into § 20, act of June 30, 1885, P. L. 199, the alleged practice of the governor and secretary of the commonwealth, in passing upon applications for charters, is labored.

The fact that certain companies choose to make use of the term manufacturing, would not justify the governor in refusing to approve the applications, and his approval is no indorsement of the defendant's theory. Moreover, it will be seen, on consulting the appendices to the pamphlet laws of 1885, 1886, and 1887, that in the great majority of cases the applicants for charters . for electric light companies carefully abstain from the use of the word manufacture.

OPINION, MR. JUSTICE WILLIAMS :

This case presents a new and an interesting question, viz.: Is a company that produces electricity, and sells it to customers for the generation of light, heat, or power, a manufacturing company within the meaning of the act of 1885, exempting the capital stock of manufacturing companies from taxation ?

This case was tried without a jury, and the facts upon which the judgment was based appear in the findings of the court below. One of these, which was based upon the opinion and largely expressed in the words of an expert electrician, who was called as a witness, asserts that the electricity sold by the company was created by the process adopted by the company. The learned judge says : " The electricity which furnishes the light does not exist until the armature revolves. The revolution of the armature brings into being something that did not exist before ; that is, this electric energy, or energy in this electric form." In the same finding, he describes the process by which this product is evolved or created as follows : Coal is burned under the boilers, producing heat. The heat generates steam in the boilers, which moves the engine. The engine supplies the power by which the armature is made to revolve. The revolution of the armature produces electric currents where they did not exist before. The electricity thus generated is carried over wires provided by the company, and delivered to its customers, where it is used to produce light. The process by which electricity is made to furnish light is found to consist of the movement of an electric current from one carbon point to another which are made part of its circuit. In leaping from one point to another great heat is developed by the energy of the current. This heat liberates or evolves from the carbons a gas which it burns. The light is thus found to

be due partly to the passage of the electric current between the carbon points, and partly to the combustion of the gas furnished by the heated carbons. Notwithstanding these findings, which showed a creation, or " bringing into being where it did not exist before," of the electricity sold by the company, the learned judge held as matter of law that the process was not one of manufacture, because the product was not a material substance. Conceding that the thing sold was " brought into being," made, " manufactured," in the common use of that word, he denied that such making was in a legal sense a manufacture, because it did not appear affirmatively of what the mysterious product was made, and that it was material, as matter is now defined. This conclusion appears to have been drawn from the derivation and definition of the word manufacture, and is forcibly presented in a learned opinion, in which lexicons and books of reference are largely drawn upon. It is very clear that the word originally meant hand-made. It is equally clear, in the light of the definitions collated by the learned judge, that its meaning has expanded with the advance of the arts and sciences, until it has come to mean, as a verb, the making of anything by human art or skill: Burrill's Law Dict.; and, as a noun, anything made by art or skill: Rap. & L. Law Dict.

The mere appropriation of an article which is furnished by nature is not a manufacture. Thus the liberation of natural gas or oil from the earth, and its transportation to consumers, is not a manufacture, but the production of illuminating gas is: Nassau Gas Light Co. v. Brooklyn, 89 N. Y. 409; also, Emerson v. Commonwealth, 108 Pa. 111. The collection, storage, preparation for market, and transportation of ice is not a manufacture, but the production of ice by artificial means is: People v. Ice Co., 99 N. Y. 181. A telegraph company produces electricity by artificial means, but it uses it in its own business as a carrier of messages for the public; so does a telephone company. Both receive messages for carriage, and deliver them at the point of destination. They transport for their customers. This company whose character we are considering sells the electricity it makes, or "brings into being," as a commodity. It provides the lamps or appliances for the use of its customers, by means of which the light is produced; it sells them the

electricity, measures it as it is delivered, and is paid according to the quantity furnished. Whatever electricity may be, it seems to be absolutely within the power and under the control of the company that brings it into being. It is compelled by the process employed, to come into being. It is secured, stored, poured out, or liberated at will. Its manifestations are both seen and felt. It moves with incredible velocity and power. It carries the tones and inflections of the human voice, or moves loaded cars, depending on the volume of the current and the manner of its application. It may be, in the hands of the physician, a soothing remedial agent, and, in the hands of the law, an instrument of execution swifter and surer than the headsman's axe. It may be too early to say just what it is. The scientists whose views the learned judge adopted may be right or wrong. We have no need to decide that question. Laws are written ordinarily in the language of the people, and not in that of science; and if this case depended on the question on which it turned in the court below, we should be led by the findings of fact to a different conclusion of law from that which was there reached, and hold that this company was a manufacturing company.

But we think the controlling question in this case is that of the sense in which the words " manufacturing companies " are used in the statute under consideration. It provides that the taxes laid on corporations by the revenue laws of the commonwealth.are repealed or abolished as to manufacturing corporations. Now, if there were a class of corporations existing at that date known by the name of manufacturing companies or corporations, we must assume that the legislature intended that class, when it used the name by which the class had been known in previous legislation; and we need go no farther than the statute book to determine the legislative intent in the act of 1885.

The act of 1879 imposed a capital-stock tax on all corporations alike, so that we get no help from it. Looking back to the laws under which corporations have been created, we find that in 1836 * an act was passed providing for the organization of corporations for the manufacture of iron from the ores, with

---

* Act of June 16, 1836, P. L. 799.

Opinion of the Court.

coke or mineral coal, which was subsequently extended so as to include companies using charcoal.   This was followed in 1849* by a law which provided for the organization of " manufacturing companies " as a class of corporations.   It included the manufacture of woolen, cotton, flax, or silk goods ; of iron, paper, lumber, or salt.   In 1850, it was extended so as to include the manufacture of glass.   In 1851, printing and publishing were taken into the class.   In 1852, the making of mineral paints and artificial slate was included.   In 1853, quarrying and mining.   In 1859, the manufacture of leather and leather goods.   Mineral and carbon oils were included by a series of acts passed in 1856, 1859, and 1860.   It will thus be seen that the words " manufacturing corporations " had been employed as the name of a definite class of corporations for many years, and that the kinds of manufacture embraced within the class were not left to be settled by conjecture, or by reasoning built upon definitions, but had been settled by actual enumeration in the statutes referred to and some others.   When the constitution of 1873 was adopted, and when the general corporation act of 1874 † was passed in obedience to its requirements, manufacturing corporations as a class were provided for, and the kinds of manufacture included made certain by a long series of statutes.   The act of 1874 provided a uniform mode for the incorporation of companies formed for profit, describing them as corporations of the second class; while corporations not for profit composed the first class.   In the second class were included, among others, companies formed for " carrying on any mechanical, mining, quarrying, or manufacturing business, including all the purposes covered by the provisions of the act of general assembly entitled 'An act to encourage manufacturing operations in this commonwealth, approved April 7, 1849,' " and its several supplements.   Thereafter any company formed for the prosecution of the objects enumerated in the act of 1849 and its supplements, entered the class of manufacturing corporations through the gate opened by the act of 1874, instead of through previous legislation.   But, whether they came in the one way or the other, if they were within the class as the

---

* Act of April 7, 1849, P. L. 563.
† Act of April 29, 1874, P. L. 73.

legislature had made it, the act of 1885 relieved them from the tax imposed by the act of 1879. A company supplying illuminating gas is, in the general sense of the word, a manufacturing company: Nassau Gas-Light Co. v. Brooklyn, supra; but it is not a member of the statutory class built up under the act of 1849, nor is any corporation engaged in the service of its customers in a quasi public capacity. A municipality may furnish water and light to its citizens. A company performing this service may be said to perform a quasi public or municipal function, which the municipality may disturb at its pleasure, or supersede altogether. Such companies have never been included in any of the legislation provided for the encouragement and protection of manufacturing corporations, and have no right to share in the benefits of such legislation. They really form a class by themselves. When the act of 1885 was passed, laws had been made in adjoining states which gave encouragement to the establishment of factories by exempting them from certain forms of taxation. The mischief to be remedied was the danger that such legislation might lead to the removal of capital and labor from this state to others, to the detriment of the business and prosperity of our own. The remedy provided was the removal of the tax imposed by the act of 1879, so as to remove the inducement to leave the state. It was as broad as the mischief which it was intended to meet, and made applicable to the class which since 1836 it had been the policy of the state to encourage, viz., "manufacturing corporations." It did not reach financial corporations like banks and insurance companies, nor transportation companies, nor companies performing functions partaking of a municipal character, but that class of productive industries which the legislature had sought to encourage as a means of bringing and keeping within our borders capital and labor, to be employed in the development of our mineral wealth, and in the production of the staples of commerce.

We think the learned judge reached a correct conclusion in this case. The appellant is not within the exemption or immunity provided by the act of 1885, but we prefer to rest our judgment on the definition of "manufacturing corporations" which the legislature has adopted and adhered to for more than

half a century, rather than upon the meaning of the word "manufacture" as it is given by lexicographers.

The judgment is affirmed.