In re CHARLES TOWN LIGHT & POWER CO.

(District Court, N. D. West Virginia. November 23, 1910.)

1. BANKRUPTCY (§ 88*)—INVOLUNTARY PROCEEDINGS—SUFFICIENCY OF PETITION.

Under Bankruptcy Act July 1, 1898, c. 541, § 59f, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), which provides that "creditors other than original petitioners may at any time enter their appearance and join in the petition," creditors may join at any time before adjudication, even though it be more than four months after the act of bankruptcy was committed, and will be counted to make up the requisite number of creditors and the amount of claims required by the act.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 88.*]

2. BANKRUPTCY (§ 72*)—PERSONS SUBJECT TO ACT—"TRADING" CORPORATIONS—"MANUFACTURE."

Electricity generated for the purpose of furnishing light, heat, and power is a product of "manufacture" and a commercial commodity, and a corporation whose business it is to buy electricity and resell it to consumers for such purposes at a profit is engaged principally in "trading,"

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

within the meaning of Bankruptcy Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (U. S. Comp. St. 1901, p. 3423), and may be adjudged an involuntary bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*

For other definitions, see Words and Phrases, vol. 5, pp. 4344-4346; vol. 8, p. 7716; vol. 8, p. 7053.

What persons are subject to bankruptcy law, see note to Mattoon Nat. Bank v. First Nat. Bank, 42 C. C. A. 4.]

**3.** BANKRUPTCY (§ 72*)—"TRADE."

"Trade," within the bankruptcy act (Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 [U. S. Comp. St. 1901, p. 3423]), is the buying and selling of merchandise or any class of goods, deriving a profit therefrom.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 72.*

For other definitions, see Words and Phrases, vol. 8, pp. 7037-7042.]

**4.** WORDS AND PHRASES—"DYNAMO"—"GENERATOR."

A "dynamo" or "generator" is a mechanism which generates electromotive force by moving a closed circuit in a magnetic field.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, p. 2298.]

**5.** WORDS AND PHRASES—"PRIMARY BATTERY"—"SECONDARY BATTERY"—"STORAGE BATTERY."

A "primary battery" is one in which chemical action takes place directly to produce electromotive force, while in a "secondary battery" the electromotive force is produced by a chemical action set up after a current of electricity has been passed through the cell for some time. Secondary batteries are commonly called "storage batteries."

[Ed. Note.—For other definitions, see Words and Phrases, vol. 6, p. 5550; vol. 7, p. 6378.]

**6.** WORDS AND PHRASES—"SAL AMMONIAC."

The electrolyte commonly known as "sal ammoniac" is a solution of chloride of ammonium.

In the matter of the Charles Town Light & Power Company, alleged bankrupt. On petition in involuntary bankruptcy. Order of adjudication.

A petition in involuntary bankruptcy was filed herein by C. J. Devore, a single creditor. alleging defendant to be a corporation, principally engaged in trading and mercantile pursuits, owing petitioner a debt of over $2,600, having less than 12 creditors, and with having committed acts of bankruptcy: (a) By causing to be recorded within four months of the filing of the petition a conveyance by mortgage or deed of trust all of its property to secure $18,000 of bonds; and (b) by suffering a receiver to be appointed for it by a state court. To this petition answer has been filed by the alleged bankrupt, averring itself to be a corporation chartered for the purpose of "supplying light and power by electricity to the public at Charles Town, Jefferson county, W. Va., and to such persons, partnerships, and corporations residing therein or adjacent thereto as may desire the same," denying that it is "engaged principally in trading and mercantile pursuits," denying that its creditors are less than 12, but alleging their numbers to be between 17 and 20, and setting forth the names and addresses of some 17 of such creditors. It admits that it executed the deed of trust to secure $18,000 of bonds on November 18, 1904, for the purpose of betterment of its plant, to which it alleges the money was applied, and admits that such deed of trust was not admitted to record until within four months of the filing of this petition, but why not, was, it alleges, for reasons known to the trustee and not to it. It denies the execution and recordation of this deed of trust to be an act of bankruptcy. It admits its assent to the appointment of a receiver for it

"because, for prudential business reasons, it was deemed better that any conflicting claims of creditors could be more easily and with more rapidity adjudicated and arranged." It avers that it owes debts not exceeding $30,000 and owns a plant and property that cost between $35,000 and $45,000 and has contracts with the town of Charles Town and with other corporations and individuals, and the "question of its insolvency would depend upon the market value of this plant and property * * * and the value of its contracts."

Pending consideration of this petition, the Shenandoah Valley Bank and the Winchester & Washington City Railway Company, as creditors, have entered appearances and joined in the petition, as provided in section 59f of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), and some 12 other creditors have also appeared and expressed opposition to the adjudication of the defendant as bankrupt. By order, the issue raised by petition and answer was referred to a referee "to ascertain and report the facts"; but since the entry of this order counsel have agreed certain facts and submitted the cause to this court for decision.

The agreed facts substantially are: That prior to March 26, 1906, the alleged bankrupt company generated electricity by its own power at its plant in Charles Town, and still has in possession this plant and electric equipment; that on said 26th day of March, 1906, it entered into a contract with the Winchester & Washington City Railway Company whereby it contracted to buy from the latter, under certain terms and conditions set forth in the contract, its entire supply of electricity to be supplied over the alleged bankrupt's lines by the railway company from its power plant on the Shenandoah river three miles from Charles Town; that since the execution of said contract it has not been generating electricity at its own plant, but has been selling and delivering over its own lines the electricity so purchased by it from the railway company to its patrons in Charles Town, including the town itself, under a contract exhibited, its profit being the difference between the price at which it so purchased this electricity and the higher price at which it sells it, delivered to its customers in Charles Town.

George M. Beltzhoover, Jr., for petitioners.
Forrest W. Brown, for defendant.

DAYTON, District Judge (after stating the facts as above). Counsel for the alleged bankrupt in argument now insists that this petition must be dismissed for two reasons: First, the petition is filed by a single creditor when more than 12 creditors are shown to exist. Second, because the alleged bankrupt corporation is not a trading company within the meaning and intent of the bankrupt act.

The first proposition can be readily disposed of. Section 59f of the act provides:

"Creditors other than original petitioners may at any time enter their appearance and join in the petition, or file an answer and be heard in opposition to the prayer of the petition."

Under this provision it is now well settled that creditors may join at any time before adjudication, even though it be more than four months after the act of bankruptcy was committed, and will be counted to make up the number of creditors and the amount of claims required by the act. In re Stein (Second Circuit) 105 Fed. 749, 45 C. C. A. 29; In re Plymouth Cordage Co. (Eighth Circuit) 135 Fed. 1000, 68 C. C. A. 434; In re Romanow (D. C.) 92 Fed. 510, 512; In re Mercur (D. C.) 95 Fed. 634. In these cases, and especially in the Plymouth Cordage one, the exact questions involved in this proposition here are determined. Therefore the two intervening creditors,

recognized and set forth as such in the answer of the alleged bankrupt, having joined in the prayer of Devore's original petition before adjudication, and the debts due these three together being sufficient to give jurisdiction, I must overrule the motion to dismiss on this first ground assigned.

The second ground for dismissal presents a far more difficult and perplexing question. The petition alleges the defendant to be "engaged principally in trading and mercantile pursuits." The defendant by its answer denies its business to be of this character.

In ordinary language the word "trade" is employed in three different senses: First, in that of the business of buying and selling; second, in that of an occupation generally; and, third, in that of a mechanical employment, in contradistinction to agriculture and the liberal arts. Ordinarily, when we speak of "trade," we mean commerce or something of that nature; when we speak of "a trade," we mean an occupation, in the more general or the limited sense. As used in a statute seeking to make unlawful combinations to create or carry out "restrictions in trade," the word is used as the mere equivalent of commerce or traffic. Citing Queen Ins. Co. v. State, 86 Tex. 250, 24 S. W. 397, 400, 22 L. R. A. 483; United States v. Patterson (C. C.) 55 Fed. 605, 639; 8 Words and Phrases, 7038.

It is very clear that the bankrupt act uses the word in the first sense; that of buying and selling merchandise or any class of goods, deriving a profit therefrom.

The fact is undisputed that this company is buying, selling, and delivering electricity to its patrons for profit. Therefore the question resolves itself into whether electricity is a commercial commodity that can be "manufactured," "produced," "generated" in form to be bought and sold in commerce, or is it a natural force, like water and air, that can only be confined and directed? Loveland, in his work on Bankruptcy (3d Ed. 178), cites in a note the only case I have been able to find where the question has been directly passed upon by a court of bankruptcy. This is the case of In re Suburban Electric Co., decided by one of the District Courts of Kentucky, where an electric light company, furnishing power and light, was adjudged bankrupt. Unfortunately, as Loveland says, the case was never reported, and we are therefore deprived of the court's reasoning upon which such adjudication was made. On the other hand, in Re New York & W. Water Co. (D. C.) 98 Fed. 711, it is held that a water supply company transporting and supplying water to its patrons was not "engaged in trading" within the meaning of the bankruptcy act.

In construing certain tax laws, generally, having for their purpose the favoring of manufacturing industries by relieving them of taxation, the question has several times arisen whether electric companies are "manufacturing" ones within the meaning of such acts. Up to this date there is direct conflict in the decisions with the appellate courts of New York (People ex rel. Brush Electric Mfg. Co. v. Wemple, 129 N. Y. 543, 29 N. E. 808, 14 L. R. A. 708) and of Alabama (Beggs v. Edison Electric Illuminating Co., 96 Ala. 295, 11 South. 381, 38 Am. St. Rep. 94), asserting the affirmative, while those of Maryland (Frederick Electric Light & Power Co. v. Mayor, etc.,

of Frederick City, 84 Md. 599, 36 Atl. 362, 36 L. R. A. 130) and New Hampshire (Williams v. Warren, 72 N. H. 305, 56 Atl. 463, 64 L. R. A. 33) hold the negative. The Supreme Court of Pennsylvania has had trouble with the question. In Com. v. Northern Electric Light & P. Co., 145 Pa. 105, 22 Atl. 839, 14 L. R. A. 107, while affirming the judge below in holding, under the terms of its statute, the electric company to be subject to taxation, it expressly registered its dissent to his reasoning whereby he determined that such companies were not engaged in manufacture; but the force of this dissent was subsequently greatly weakened by other decisions. Com. v. Keystone Electric L. H. & P. Co., 193 Pa. 245, 44 Atl. 326; Southern E. L. & P. Co. v. Philadelphia, 191 Pa. 170, 43 Atl. 123.

It has been repeatedly held that gas companies are strictly manufacturing corporations, within both the letter and the spirit of such tax laws favoring manufacturing industries. Dudley v. Jamaica Pond A. Corp., 100 Mass. 183; Nassau Gaslight Co. v. Brooklyn, 89 N. Y. 409; Schuylkill County v. Citizens' Gas Co., 148 Pa. 162, 23 Atl. 1055. But, on the other hand, the impounding and supplying of natural gas for fuel has been held not to be manufacturing. Emerson v. Com., 108 Pa. 111; Com. v. Northern E. L. & P. Co., 145 Pa. 105, 22 Atl. 839, 14 L. R. A. 107.

The Supreme Court of Maine, in Edison United Mfg. Co. v. Farmington Electric L. & P. Co., 82 Me. 464, 19 Atl. 859, has held an electric light company to be just like a gas company. "Each," it says, "supplies a town with artificial light. Each manufactures its power." The Supreme Court of Maryland, having decided, in the Frederick City Case, as stated above, that electric companies were not "manufacturing" ones, in the more recent case of Purnell v. McLane, 98 Md. 589, 56 Atl. 830, holds that the "right to produce and sell electricity as a commercial product without legislative authority is open to all." The justices of the Supreme Court of Massachusetts in an opinion to the Legislature of the state (Opinion of the Justices, 150 Mass. 592, 24 N. E. 1084, 8 L. R. A. 487), repeatedly use expressions indicating their belief that generating and supplying electricity are manufacturing. In Mauldin v. Greenville, 33 S. C. 1, 11 S. E. 434, 8 L. R. A. 291, the Supreme Court of South Carolina asks this question:

"The city has the express power to own property, and it also has the implied right to light the city. Do these powers necessarily imply the right to make the city the owner of the plant and a manufacturer of electricity?"

But it is needless to pursue further the decisions of the courts touching directly and indirectly this question. Those who may be curious to know what difficulty the courts have had in defining what "manufacture" means can find the authorities fully collated in a very able and exhaustive note to the case of Williams v. Warren, supra, as reported in 64 L. R. A. 33.

It is clear to my mind that all judicial definitions must necessarily change and enlarge to an extent in order to conform to new and changed conditions.

Electricity, whatever it may be, exhibiting itself in its free state in the form of lightning's bolt, ought in reason to be distinguished from

that, which, under perfect control, runs the electric car, the automobile, furnishes artificial light and heat, or conveys the messages by telegraph and telephone wires. Nature makes the one; man "generates" or "manufactures" the other by combination or contact of elements that nature furnishes. The one may be well termed natural or free electricity; the other commercial electricity.

From the text-books on the subject we learn that man "generates" or produces electricity, or electromotive force in three ways: First, by chemical action between two or more bodies; second, by the heating of the junction point of two dissimilar metals; third, by the movement of a closed circuit in a magnetic field. For commercial purposes the first and third methods only are common. The second method is used only in laboratory experiments. A mechanism which is used to generate electromotive force by moving a closed circuit in a magnetic field is called a "dynamo" or "generator." This is the method adopted to secure such electricity for heat, light, and power, and, as the New York court says, renders it necessary to invest large capital in a plant, which might be, appropriately enough, called a factory, to purchase and consume vast stores of coal (or other fuel or force) to make steam and furnish power to operate a complicated system of machinery, boilers, engines, dynamos, shafting, belting, and other things common in manufacturing establishments.

Then, too, the apparatus by means of which the electric current which conveys messages is generated is known as a "battery." Batteries are primary and secondary. A "primary battery" is defined as one in which chemical action takes place directly to produce the electromotive force, while in a "secondary battery" the electromotive force is produced by the chemical action set up after a current of electricity has been passed through the cell for some time. Secondary batteries are commonly called "storage batteries." There are many types of primary batteries; each possessing peculiar features. In all forms, however, the electromotive force is generated by chemical action, taking place between two dissimilar bodies called the "elements," which are surrounded by a liquid called the "electrolyte." The electrical potential generated depends on the nature of the substances used as elements. In telephone practice, for example, besides some forms of dry batteries, four types of batteries are available: First, the gravity battery, in which the elements are metallic zinc and metallic copper, and the electrolyte is a solution of copper sulphate in water. Second, the Le Clanche cell battery, in which the elements are zinc and carbon, and the electrolyte is a solution of chloride of ammonium, commonly known as "sal ammoniac." Third, the Fuller cell, in which the elements are zinc and carbon, and the electrolyte consists of a solution of three parts bichromate of potash, 1 part sulphuric acid, and 9 parts water. Fourth, the Edison-Lalade cell, in which the elements are zinc and copper oxide, and the electrolyte is oxide of potassium or caustic potash dissolved in water.

Thus it is seen that, unlike the utilization of water and air by simple control and guidance of them to the desired end, commercial electricity is produced by labor, machinery, and by chemical combination of various different elements. To do this is the very essence of man-

ufacture—"the making of something from raw materials by hand, by machinery, or by art." And, when so manufactured, it cannot be denied that electricity can be bought, sold, measured, and delivered. Therefore companies like the defendant here may make it their principal business to so buy, sell, measure, and deliver electricity and in doing so become "trading companies" within the meaning of the bankrupt act.

The defendant, the Charles Town Light & Power Company, will be adjudicated bankrupt.