RITER-CONLEY MFG. CO. v. AIKEN et al.

(Circuit Court of Appeals, Third Circuit. January 28, 1913.)

No. 1,648.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ROOF STRUCTURE.

The Aiken patent, No. 718,044, for a roof structure designed for use on large manufacturing buildings or sheds, by which light and ventilation are secured without building cabins or other structures above the roof, by dropping every alternate transverse section of the roof to the lower chord of the trusses and placing windows in the vertical sides of the higher sections, discloses a device which was novel, useful, and inventive in character; also *held* infringed.

2. PATENTS (§ 13*)—SUBJECTS OF PATENTS—MANUFACTURES—BUILDING STRUCTURES—"USEFUL ART"—"MANUFACTURE."

Building is a "useful art," within the meaning of article 1, § 8, of the Constitution, authorizing Congress to provide for the granting of patents to "promote the progress of * * * useful arts"; and a building, or a structure which forms part of a building, if it involves novelty and invention, is patentable as a "manufacture," under Rev. St. § 4886 (U. S. Comp. St. 1901, p. 3382.)

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 11, 12; Dec. Dig. § 13.*

For other definitions, see Words and Phrases, vol. 5, pp. 4344–4346; vol. 8. pp. 7716, 7238.]

3. PATENTS (§ 13*)—CONSTRUCTION OF STATUTE—CONSTRUCTION BY PATENT OFFICE.

The uniform practice of the Patent Office in granting patents for building structures, and their recognition by the courts, are entitled to weight on the question whether such structures are "manufactures" within the meaning of the statute.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 11, 12; Dec. Dig. § 13.*]

4. PATENTS (§ 13*)—CONSTRUCTION OF STATUTE—"MANUFACTURE."

The term "manufacture," as used in the patent law, has a very comprehensive sense, embracing whatever is made by the art or industry of man, not being a machine, a composition of matter, or a design.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 11, 12; Dec. Dig. § 13.*]

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by Nellie C. Aiken and Nellie C. Aiken, Jr., against the Riter-Conley Manufacturing Company. Decree for complainants, and defendant appeals. Affirmed.

John H. Rouey, of Pittsburgh, Pa., for appellant.

Kay & Totten and W. W. Wishart, all of Pittsburgh, Pa., for appellees.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below Nellie C. Aiken et al., plaintiffs, by their bill charged the Riter-Conley Manufacturing Company with infringing patent No. 718,044, granted January 6, 1903,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to Henry Aiken for a roof structure. That court on final hearing held the patent valid and infringed. From a decree accordingly, the defendant appealed.

[1] The questions involved are, first, whether the device is novel and involves invention; and, secondly, if so, is a roof structure patentable? This patent is especially adapted for use in the construction of large manufacturing sheds or factories, the parts of which are initially constructed in structural steel works and subsequently removed to and erected on the factory site. Prior to the device in suit it was usual to build on the roofs of such structures cabins with two glass sides, or in the case of saw-tooth ones, with a single glass side, to secure light and ventilation. As such buildings increased in size, and especially in width, it was found such superimposed cabins not only caused additional expense, but their weight and exposure to wind strains by reason of their height necessitated very considerable additional strength and material in the frames of the buildings. Henry Aiken, the grantee of this patent, was a structural and mechanical engineer of large experience and practice. He conceived the idea that he could not only wholly eliminate these super-roof structures, but could also so sectionally utilize the roof area itself as to obtain all the advantages and incur none of the disadvantages incident to the use of such cabins. This device, which was exceedingly simple, he disclosed in the patent in suit. Instead of following the universal practice of seating the entire roof on the upper chords of the roof trusses, he dropped every alternate, transverse cross-section of the roof to the height of the lower chord of the roof trusses and seated such section on the lower chords. He thereby secured alternate high and low transverse roof sections, with windows placed vertically the entire width of the building in the plane of the truss sides. In this construction the light supply was brought nearer the floor, with a consequent better diffusion.

The practical advantages of the Aiken system are shown by the proofs. Emil Swenson, who was closely connected with the development of steel building construction by the Carnegie Steel Company, testified:

" * * * Up to this time the methods for providing light had necessitated the superimposed addition of ventilators, dormers, monitors, cabins, and the like, that the main roof structure had to carry, not only by their own weight, but by their added load through increased cross-section area of the structure. These loads had to be carried by the main structure, requiring additional constructive strength in the roof structure of the building itself. The desire for concentration of processes and departments of an industry under one continuous roof, to save the cost of walls necessary if the buildings were separated, and also economizing in the required acreage for a certain give'. plant, especially for some new industries that had sprung up in the '90's, such as the steel car industry, reached such proportions that roof structures several hundred feet wide were demanded. The problem of lighting thus reached its maximum and it was necessary to get the windows as close to the work as possible. It was then that the happy thought must have occurred to Mr. Aiken to depress alternate bays and utilize the web system for the roof trusses themselves to support the windows; in other words, to make a depressed cabin, instead of a raised cabin, thus saving entirely the cost of the superimposed or false cabin frame. Thus a lighting method had been found

that well diffused the light, came closer to the floor, and remained constant to the floor unit, and that was quite a substantial saving in the cost of the roof structure."

Speaking of wind strains he says:

"The highest point reached by the wind in the case of the monitor construction is always above the like point in the Aiken structure by the distance measured by the height of the monitor itself; the wind blowing on such a point, having a greater momentum, would produce a greater result in wind stresses, because of its greater distance from the base of the columns, which is usually at the ground level."

The device at once found favor. When the proofs were taken more than 2,000,000 square feet of such roof structure were in use, and the validity of the patent and the substantial benefit of the device were impliedly recognized to the extent of $45,000 paid in royalty.

It will be noted that the device is a roof section of several parts structurally combined and co-operating in a particular way, and at the same time, to effect diffusion of both air and light, and is not for an architectural design or an economic or desirable plan of utilizing house space. Its purpose is the diffusion of light and the movement of air in a combination of structural elements, to wit, series of parallel trusses and roof section at different truss chord levels, whereby intermediate truss and subroof light and ventilation were obtained.

Referring, then, to the first question involved, it is clear to us that, as also found by the court below, the device was novel, useful, and inventive in character, in that several elements conjointly co-operate to secure a unitary result.

[2] This brings us to the second question—whether a roof structure is patentable. In that regard it will be noted that, to carry out its expressed purpose, "to promote the progress of * * * useful arts," the Constitution empowered Congress to secure "for limited times to * * * inventors the exclusive rights to their respective * * * discoveries." There can be no doubt that building is one of the useful arts, and therefore one whose progress was embraced in the comprehensive term of the Constitution. Any discovery that promoted progress in that art, therefore, fell within the power delegated to Congress. In pursuance of that power Congress enacted in 1790 and 1793, in terms ever since substantially followed, that:

"Any person who has invented or discovered any new and useful art, machine, manufacture, or composition," etc.

That this patent is not for an art, a machine, or a composition of matter is, as it could not be otherwise, conceded; so that the question is: Is it covered by the term "manufacture"? To us it is clear that as building is embraced in the inclusive scope of "useful arts," and as buildings, both as a whole and in their constituent parts of wood, brick, glass, iron, etc., are manufactured products, and not natural objects, they fall within the broad terms "manufacture" of the act of Congress and "useful arts" of the Constitution. From its original derivation of *facere manu,* or handworked products, the word has broadened into all means of treating raw materials, and in modern times its dictionary definition is "anything made from raw materials

by hand, by machinery, or by art." Such being the fact, it would seem to follow that the burden of proof is on him who contends that buildings and parts thereof are not embraced by the statute in question.

[3] Moreover, it is a well-settled principle of federal statutory interpretation that the construction given a statute by those charged with its execution has weight with courts, and will not be overruled without cogent reasons. U. S. v. Moore, 95 U. S. 763, 24 L. Ed. 588, and cases cited. Applying this principle to the present case, it seems the Patent Office has construed the word "manufacture" to cover buildings, and has issued large numbers of patents accordingly. Thus, class 20 of the Patent Office covers wooden buildings, and under modern development has been extended to include steel-framed structures, and includes 97 different subclasses, under which patents are issued for doors, windows, floors, supporting columns, wall construction, and other parts of buildings. Roofs form a separate class, No. 108, and under this head we find numerous subclasses of roofs, under the various subheads of adjustable, fabric-lined, metal-lined, composite, fireproof, lap-joints, shingle, observatory domes, portable, skylight, slate, trusses, etc. Not only has such been the practice of the Patent Office, but the fact that, in the many cases where courts have adjudicated patents issued under such assumed power, none has ever seemed called upon to question it, affords strong support to a construction so long and widely followed. In U. S. v. Commonwealth, 186 Fed. 291, 108 C. C. A. 337, this court referred to a construction of law thus acted upon by boards of Pennsylvania county commissioners and said:

"Such has been the view on which the affairs of Pennsylvania counties as poor districts have been administered for years, and, as our holding of the bonded liability of county commissioners acting with reference to the poor district is in accord with that firmly established practice, our decision is in line with that salutary principle of interpretation which makes fixed practice its own interpreter, and which is referred to in Stuart v. Laird, 1 Cranch, 308, 2 L. Ed. 115. There it was sought to raise the question that the justices of the Supreme Court had no right to sit as Circuit Judges; but the court said: 'To this objection, which is of recent date, it is sufficient to observe that practice, and acquiescence under it, for a period of several years, commencing with the organization of a judicial system, affords an irresistible answer, and has, indeed, fixed the construction. It is a contemporary interpretation of the most formidable nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course, the question is at rest and ought not to be disturbed.' "

But, considering the question as unaffected by this long course of practice, we are clear that the term "manufacture" in the patent law embraces buildings. To say that a roof falls within the domain of architecture is not to decide the question; for the question is not whether a roof construction is included in architecture, which, of course, it is, but whether the roof section here in question is, in view of its several constituent and co-operating elements, a manufacture. We must not be misled by the factors of size and immobility. The pyramids, by reason of their bulk and solidity, are none the less a manufacture, as distinguished from a natural object.

[4] The ideas of operative motion and mobility are so intimately associated with the word "machine," and machines are so frequently the

subjects of patents, that we naturally disassociate the idea of a patent with a building. But the fact that the terms "machine" and "manufacture" are both used in the statute shows the latter was meant to include subjects the former did not. Thus, whether required in that case or not, the statement of Judge Acheson in Johnson v. Johnston (C. C.) 60 Fed. 618, that "the term 'manufacture,' as used in the patent law, has a very comprehensive sense, embracing whatever is made by the art or industry of man, not being a machine, a composition of matter, or a design," is in our judgment sound. It has stood unchallenged by judicial decision and has the support of standard authors. Thus 1 Robinson on Patents, § 183, under the heading "Manufactures, a Comprehensive Class of Inventions," says:

"The species of inventions belonging to this class are very numerous, comprehending every article devised by man, except machinery, on the one side, and compositions and designs, upon the other."

Walker on Patents, page 12, says:

"Whatever is made by the hand of man, and is neither of these [machine, composition of matter, design] is a manufacture in the sense in which that word is used in the American patent law."

And Curtis on Patents, § 5, cites Hornblower v. Boulton, 8 Durnford & East, 98, where Lord Kenyon said:

"I have no doubt this patent is for a manufacture, which *I understand to be something made by the hands of man.*"

In tariff taxation, as well as commercial and bankruptcy cases, the word "manufacture" has been accorded the same meaning. Thus in Kidd v. Pearson, 128 U. S. 20, 9 Sup. Ct. 10, 32 L. Ed. 346, it is said:

"Manufacture is transformation—the fashioning of raw materials into a change of form for use."

In Tide Co. v. U. S., 171 U. S. 216, 18 Sup. Ct. 839, 43 L. Ed. 139, it is said:

"The primary meaning of the word 'manufacture' is something made by hand, as distinguished from a natural growth; but, as machinery has largely supplanted this primitive method, the word is ordinarily used to denote an article upon the material of which labor has been expended to make the finished product."

In Commonwealth v. Northern Co., 145 Pa. 105, 22 Atl. 839, 14 L. R. A. 107, the Supreme Court of Pennsylvania said, of a company engaged in iron roof, bridge, and structural work, that the meaning of the word "manufacture"—

"has expanded with the advance of the arts and sciences until it has come to mean, as a verb, the making of anything by human art or skill, and, as a noun, anything made by art or skill."

And referring later to this definition in Commonwealth v. Keystone Bridge Co., 156 Pa. 503, 27 Atl. 2, in a case involving a similar corporation:

"If the definition just quoted is to be applied to the present defendant, then putting a roof or bridge together is the making of something by art or skill, and is manufacture as truly as making the constituent parts."

The Circuit Court of Appeals of the Eighth Circuit in Re First Nat. Bank of Belle Fourche, 152 Fed. 67, 81 C. C. A. 263, 11 Ann. Cas. 355, held:

"The word 'manufacture' is a generic term of broad significance, advisedly used by Congress to include many species of corporations, and its comprehensive meaning ought not to be whittled away by fine distinctions."

Where the question involved was whether a corporation engaged in constructing in place cement arches, walls, bridges, and buildings was engaged in manufacturing within the bankrupt law, the Supreme Court of the United States in Friday v. Hall, 216 U. S. 451, 30 Sup. Ct. 262, 54 L. Ed. 562, 26 L. R. A. (N. S.) 475, said:

"The production of concrete arches, or piers, or abutments, is the result of successive steps. The combination of raw material, the sand, the limestone, the cement, and the water, produced a product, which undoubtedly was manufactured. This concrete had then to be given shape. That required the manufacture of molds, which remain in place until hardening occurs. If the concrete is reinforced, as is the case where great strength is required, then the adjustment of the bars of steel within the mold was another step. Do all of these steps, each a step in 'manufacturing,' cease to be 'manufacturing' because the molds into which the concrete is poured, when in a fluid state, are upon the spot where the finished product is to remain? That the operation of making and shaping the concrete is done at the place used seems rather a matter of convenience, due to the quick hardening in molds and difficulties of transportation. But, as we may take notice, the operation which in the end is to produce an arch, or abutment, or pier, or house, is not necessarily a single operation, but one of successive repetitions of the process. The business is not identical with that of a mere builder or constructor, who puts together the brick or stone or wood or iron, as finished by another. If the builder made his brick, shaped his timbers, and joined them altogether, he would plainly be a manufacturer, as well as a builder; and if the former was the principal part of the business, he would be within the definition of the bankrupt act. To say that one who makes and then gives form and shape to the product made is not engaged in manufacturing, because he makes his product and gives it form and shape in the place where it is to remain, is too narrow a construction."

Applying the principle of this last decision to the facts in hand, we may say that the infringing defender, instead of making his brick, shaping his timber, and joining them together, whereby "he would plainly be a manufacturer," is none the less a manufacturer because he has substituted for timber and brick the steel trusses and roof supports incident to building development, manufactures such roof sections part by part in his factories, and then removes and assembles them in a permanent structure. And if the making of these constituent parts is manufacture, we see no logical escape from the conclusion that the roof wherein these parts are assembled and used is in fact a thing manufactured, and therefore within the word "manufacture" as used in the patent law. The reasoning in support of this conclusion can be summed up in no clearer words than those found in Commonwealth v. Keystone Bridge Co., supra, where the Supreme Court of Pennsylvania adopted the opinion of our Brother McPherson, then on the common pleas bench of Pennsylvania, as follows:

"The defendant is unquestionably a manufacturing company up to the point when the various parts—beams, girders, rods, bolts, and the rest—are ready to be put together in order to form the complete structure for which they

were intended. The preparation of these parts from material, either raw or unfinished, is clearly manufacturing within any accepted definition of the word; and if in all cases the transaction was finished by a sale of the parts to a purchaser, who would himself put them together and thus complete the structure for use, the exclusively manufacturing character of the corporation could not be questioned. Is this character destroyed simply because the defendant, after having manufactured the various parts of a contemplated bridge, or viaduct, or turntable, or roof, goes one step further and finishes the structure? Upon reason we think this question ought to be answered in the negative, and especially because the separate parts are comparatively useless, and are made for no other purpose than to put them together. In the case of such a corporation as this, the power to build or erect (if, indeed, it ought to be considered as a distinct and separate power) is a proper and perhaps a necessary incident to the powers which are unquestionably manufacturing. In other words, if a corporation may frame and fashion all the parts of a bridge, it has an implied power to put the parts together in their intended seat. If it may build the bridge or the roof experimentally in its yard, it may surely build it in the very place for which it was designed. It is not easy to see why it becomes necessary to divide a business which seems to be a natural unit, and to regard it as incapable of being carried on unless two distinct franchises are given—one to prepare the material, and the other to erect the structure. It seems to us more reasonable to hold that, if a corporation may manufacture a bridge in parts, it may under the same franchise put the parts together and deliver the bridge as a whole in place to the purchaser, and that it is exclusively manufacturing as truly when it is finishing the work as when it is only beginning. We see no escape from the conclusion, if the subject is to be examined from this point of view."

In accordance with the views here expressed, the decision of the court below is affirmed.